# Illinois Official Reports

## Appellate Court

---

**Steel & Machinery Transportation, Inc. v. Illinois Workers' Compensation Comm'n,
2015 IL App (1st) 133985WC**

---

| | |
|---|---|
| Appellate Court Caption | STEEL AND MACHINERY TRANSPORTATION, INC., Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Radomir Cvetkovski, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division<br>Docket No. 1-13-3985WC |
| Filed | May 1, 2015 |
| Rehearing denied | July 7, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-50386; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Paul A. Krauter, of Roddy, Leahy, Guill & Zima, Ltd., of Chicago, for appellant.<br><br>Osvaldo Rodriguez, of Law Offices of Osvaldo Rodriguez, P.C., of Elmwood Park, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Justices Hoffman, Harris, and Stewart concurred in the judgment and opinion.<br>Presiding Justice Holdridge dissented, with opinion. |

**OPINION**

**I. INTRODUCTION**

Respondent, Steel & Machinery Transportation, Inc., appeals from the judgment of the circuit court of Cook County confirming a decision of the Illinois Workers' Compensation Commission (Commission) awarding benefits to claimant, Radomir Cvetkovski, pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2004)). On appeal, respondent argues that the Commission erred in finding that an employer-employee relationship existed between it and claimant. We affirm.

**II. BACKGROUND**

Claimant is an over-the-road truck driver who owns a tractor-trailer. Respondent is in the business of transporting machinery and metal products from sellers to purchasers. On Friday, June 10, 2005, respondent dispatched claimant to transport a shipment from Indiana to Wisconsin. After claimant picked up the load in Indiana, he drove his vehicle to a truck stop and went home for the weekend. Claimant resumed the delivery in the early morning hours of Monday, June 13, 2005. While driving in Illinois, claimant was involved in a motor-vehicle accident. As a result of the accident, claimant lost a portion of his left extremity below the knee. On October 3, 2005, claimant filed an application for adjustment of claim, seeking benefits for his injury. An arbitration hearing on claimant's application for adjustment of claim was held over two dates late in 2011. The following evidence relevant to this appeal was presented at that hearing.

At the time of the accident, claimant was operating under an agreement with respondent entitled "INDEPENDENT CONTRACTOR AGREEMENT" (Agreement). The Agreement classified claimant as an independent contractor. Paragraph 1 of the Agreement provided that, for the duration of the Agreement, claimant would provide respondent "transportation related services and the Equipment set forth in SUPPLEMENT A." Supplement A was an equipment schedule listing claimant's tractor and trailer. Paragraph 6(a) of the Agreement provided that the equipment described in Supplement A "shall be for [respondent's] exclusive possession, control and use for the duration of this Agreement." Paragraph 6(a) further provided, "[t]his subparagraph is set forth solely to conform with Federal Motor Carrier Safety Adm. regulations and shall not be used for any other purposes, including any attempt to classify [claimant] as an employee of [respondent]." Paragraph 8 of the Agreement provided that respondent, "having exclusive possession, control and use of the equipment covered under this lease, under it's [*sic*] sole discretion, may interchange this equipment to other authorized carriers."

The Agreement required respondent to maintain insurance to cover the equipment when it was being operated in respondent's service and claimant to acquire "bobtail" insurance to cover the equipment when it was not operated in respondent's service. In addition, the Agreement required claimant to notify respondent of any accident "involving operations under [the] Agreement." The Agreement provided that claimant would be compensated a specified percentage "of the transportation revenue after surcharges, if any." Under the Agreement, claimant was responsible for the cost of the equipment, including, but not limited to, necessary licenses, permits, oil, fuel, tires, highway use taxes, weight taxes, fuel taxes, and toll charges. In addition, claimant was required to keep the equipment "in clean

appearance" at his sole cost and expense. Furthermore, the Agreement required claimant to maintain the equipment in a safe condition and in compliance with all applicable laws and regulations. The Agreement provided respondent with the right to place and maintain on the equipment its name and lettering, advertisement, slogans or designs. The Agreement could be terminated for any reason after 30 days from its effective date by giving one day's written notice to the other party either personally, by mail, or by facsimile machine. In addition, the Agreement could be terminated at any time, by either party, in the event of a breach of the Agreement by the other party.

¶ 7    At the arbitration hearing, claimant, a native of Macedonia, testified through an interpreter. Claimant related that he began working for respondent in March 2005. Prior to driving for respondent, claimant completed an application, underwent a medical examination, and submitted to a drug test. Claimant testified that he paid for the medical examination, but he was not sure who paid for the drug test. During his first week of work for respondent, claimant met with Josephine Ramos, plaintiff's safety representative. Claimant testified that at this meeting, he and Ramos discussed "everything concerning *** the truck, everything about safety and avoiding accidents." Claimant related that he drove exclusively for respondent between his date of hire and the date of the accident.

¶ 8    Claimant acknowledged that while driving for respondent, he was responsible for maintaining and repairing his truck and trailer in a certain manner. For instance, claimant had to take the tractor-trailer for inspections, keep inspection and maintenance records in accordance with federal regulations, and post respondent's name on the side of the tractor-trailer. Claimant further testified that while respondent provided liability insurance to cover the equipment while he was transporting loads for respondent, he was required to provide his own insurance for the equipment when he was not delivering for respondent. Claimant also acknowledged that he was responsible for truck repairs, plates, and licenses. Claimant initially testified that he was also responsible for purchasing fuel and paying tolls while he was working for respondent. However, claimant later indicated that respondent reimbursed him for the fuel charges. Claimant also testified that respondent did not require him to wear a uniform. He stated that he was paid by respondent on a weekly basis by company checks.

¶ 9    Claimant testified that he obtained his work assignments from a dispatcher named Spiro Krlevski (Spiro), who is also a native of Macedonia. According to claimant, Spiro would provide him with "the numbers for the pick-up." Claimant would then drive to the designated pick-up location. When claimant picked up a load for respondent, he would identify himself as the driver for "SMT," the acronym by which respondent is known. After taking possession of the goods, claimant would travel to the delivery location. Claimant testified that it was Spiro's responsibility to call him every two hours "to check on [his] location, find out where [he is] and what's going on." Once claimant completed a delivery he would call Spiro to obtain a new assignment. With respect to the frequency of the calls claimant would make to respondent, claimant testified, "[i]t may happen three or five times a day that I would need to call the company, for instance, when I needed to report if I am empty, if I delivered." Claimant further testified that Spiro gave him specific instructions to the address he was delivering to on the night of the accident.

¶ 10    Claimant testified that it was not up to him to choose which loads he wanted to transport. Moreover, claimant testified that he would not "dare" refuse a load. When asked about the

consequences for declining a load, claimant responded that "there might be consequence [*sic*] such as me losing my job or not getting any loads for like two days." Claimant also testified that he was not free to take loads for other companies and he could not use another driver to transport a load for respondent. Claimant testified that respondent would provide him with a general time frame for each pick-up and that each load had a delivery deadline. If claimant delivered a load late, there would be a consequence, such as a late charge. According to claimant, he was assessed a late charge with respect to the load he was delivering when the accident at issue occurred.

¶ 11     During cross-examination, claimant initially denied entering into the Agreement with respondent. However, after being shown the Agreement, claimant identified his signature on the document. Although claimant testified through an interpreter, he acknowledged that he reads, writes, and understands English. Claimant was shown the bill of lading for the load he was carrying at the time of the accident. Claimant admitted that the bill of lading required him to deliver the load between 7:30 a.m. and 3:30 p.m., Monday through Friday.

¶ 12     Respondent called three witnesses at the hearing–Ramos, Herbert Schaffer, and Spiro. Ramos testified that, as respondent's director of safety, she "pre-qualifies" drivers, sets up contractor lease agreements, monitors maintenance files, and performs safety and compliance duties on respondent's behalf. Ramos described respondent's "pre-qualification" process in detail. She explained that this process involves having a prospective driver complete an application, undergo a physical, and submit to a drug test. In addition, Ramos reviews the applicant's motor-vehicle record and employment history. Ramos testified that the applicant pays for the physical and the drug screen. If an applicant is approved, he participates in an orientation process. Ramos testified that once an applicant is qualified and executes an independent-contractor agreement, it is respondent's responsibility to "continuously monitor" the driver's status. For instance, Ramos explained that federal regulations limit the number of hours a driver can drive and respondent monitors the number of hours driven. Moreover, under federal law, respondent is required to ensure that leased equipment is operated in compliance with federal guidelines. Thus, if a driver's equipment is not in compliance with federal standards, respondent would cancel the driver's agreement.

¶ 13     Ramos testified that respondent did not require claimant to wear a uniform, shave, or wear his hair in a particular manner. In addition, respondent had no input regarding how claimant introduced himself while picking up a load. Ramos testified that the equipment respondent leased from claimant would have had door signs with respondent's name and logo on it, as required by federal regulations. According to Ramos, claimant was required to inspect his truck and trailer before each trip pursuant to federal regulations. Respondent exercised no control over the type of fuel claimant purchased or where he parked. Moreover, respondent did not provide claimant with any tools or equipment. Ramos testified that each driver is responsible for obtaining his or her own bobtail insurance and workers' compensation coverage.

¶ 14     Ramos testified that she knows Spiro, the dispatcher referenced by claimant. Ramos described Spiro as an "independent agent" for respondent. Ramos testified that, in addition to using independent agents to dispatch, respondent has its own dispatch system within the company itself. Ramos testified that under the Agreement, claimant had the option to dispatch through Spiro or respondent's system. Ramos explained that, under either system, the dispatch process is essentially identical. Initially, the driver calls in for a job. If the agent

does not have a load the driver is interested in moving, he can contact a different agent or respondent's own dispatch. According to Ramos, a driver need only call dispatch when he would like to pick up a load. Claimant was not required to call in daily to report his status or work any particular shift, and he was not required to accept a particular shipment. Moreover, Ramos denied that respondent required claimant to take a specific route in delivering a load.

¶ 15 Ramos testified that once a load is delivered and the driver presents proof of delivery and log sheets, he receives payment. Payment is made by check or via a "ComData" card, which Ramos likened to a debit card. According to Ramos, claimant elected to receive his payments on a ComData card. Ramos stated that respondent did not withhold income taxes or any other type of government deduction from claimant's settlements. Respondent provided claimant with a 1099 tax form at the end of the calendar year. Ramos acknowledged that a deduction to claimant's pay was made after the June 2005 accident. According to Ramos, however, the deduction had nothing to do with the accident, but constituted charges for the late delivery of a different load.

¶ 16 Ramos testified that it is respondent's responsibility to observe and enforce all applicable federal and state regulations in transporting goods. Ramos testified that respondent monitored "paperwork" while claimant's equipment was under lease pursuant to federal regulations. Ramos testified that pursuant to a federal requirement, claimant's equipment must meet state and federal regulations before respondent can enter into a lease agreement. According to Ramos, under the Agreement, respondent did not impose any requirements above and beyond those of the federal Department of Transportation. Respondent could cancel a lease agreement if the lessor is in violation of federal regulations.

¶ 17 Ramos testified that the Agreement allowed claimant to transport goods for another company "through a brokerage operation." Under such an arrangement, the other motor carrier would pay respondent and respondent would then settle with claimant. Ramos testified that, to her knowledge, claimant did not drive for anyone except respondent between the time he first transported for respondent and the date of the accident.

¶ 18 Herbert Schaffer testified that he has been the vice-president of business development for Transportation Employment Services (TES) for four years. Schaffer related that respondent and TES are affiliated entities and that he "represent[s]" respondent as well. Schaffer testified that he has worked in the trucking industry for 41 years.

¶ 19 Schaffer testified that under an independent contractor agreement, respondent does not require drivers to wear any kind of uniform, to take a specific route to the delivery destination, or to introduce themselves to customers in any particular way. Respondent does not train the independent contractors. Moreover, the driver pays for the licensing of the equipment leased to respondent. Schaffer also testified that under an independent contractor agreement, respondent does not require drivers to shave or otherwise wear their hair in a particular manner, clean their equipment on a specified schedule, or purchase a particular type of fuel. Respondent does not instruct drivers where to park their equipment or how to inspect or maintain the equipment in cold weather. Schaffer also related that respondent does not provide drivers with any kind of tools or equipment. In addition, the drivers do not have specific work shifts, and they are not required to call in daily to report their status. Schaffer stated that a driver is not subject to any adverse consequences from respondent if he is late with a delivery. Schaffer added that respondent does not impose any requirements above and

beyond that which the federal government imposes pursuant to Department of Transportation regulations.

¶ 20      Schaffer did not work for respondent at the same time as defendant. Nevertheless, Schaffer testified that he had no reason to believe that the current dispatch process is any different than the process used in 2005, when claimant was injured. Schaffer related that under the dispatch system, a customer calls an agent and provides delivery information. A driver then contacts dispatch to inquire about an available load, where it is going, and what it pays. The driver then decides whether to take the load. If the driver does not want to take a particular load, he is free to call back later or contact another carrier that respondent will "broker freight to."

¶ 21      With respect to the process for a driver to transport freight for a carrier other than respondent, Schaffer explained as follows:

> "If we did not have a load the [driver] wanted, he could let dispatch know that he's going to go look for a load from another carrier, and then we in turn–once he did find one, he would call dispatch, say I have a load with this other carrier. We then would reach out to that carrier, make sure that we have an agreement, do credit checks, et cetera and so forth, and then release him to go haul that load for the other carrier."

Schaffer stated that he has no personal knowledge of whether claimant drove for any other carrier during the time he drove for respondent.

¶ 22      Schaffer testified that Spiro's relationship with respondent is that of an "agent" or "independent contractor." Schaffer testified that once Spiro dispatches a driver, it is entered into respondent's computer system, known as the AS-400. According to Schaffer, the AS-400 allows respondent to "know what the driver is doing and who's moving what load." The AS-400 also indicates the time and the identity of the dispatcher.

¶ 23      Schaffer testified that a "bill of lading" is a contract of carriage. He explained that the document authorizes the driver to possess the freight being transported. The bill of lading also identifies the shipper, the destination of the goods, and any special instructions, such as delivery times or if a delivery appointment is required. The driver presents the bill of lading to the recipient of goods for signature to indicate that the freight was received. Respondent then uses the bill of lading to settle payment with the driver. Schaffer noted that the bill of lading for the load claimant was delivering on the date of the accident included special shipping instructions. In particular, it stated that the recipient's receiving hours were from 7:30 a.m. through 3:30 p.m., Monday through Friday, with no appointment required. According to Schaffer, this meant there was no set time for the goods to be delivered.

¶ 24      Spiro testified that he has been an "agent" for respondent since January 2005 and that his position consists of finding loads and assigning them to drivers. Spiro testified that, typically, claimant would initiate contact with him by requesting a load to transport. Spiro denied that it was his responsibility to check on claimant's location during the delivery process. Nevertheless, Spiro acknowledged that once claimant accepted a load, he might contact claimant to check on the delivery status at the customer's request. Spiro related that claimant would also call him if he was "empty" and needed a new load. Spiro testified that claimant was free to accept or decline a load and was not subject to any adverse consequences for declining a load.

¶ 25    Spiro testified that pick-up and delivery times are dictated not by respondent, but by the customer's needs. Spiro stated that some customers have delivery windows, while others do not. Spiro noted that the bill of lading controls the time and place of delivery. Spiro testified that the bill of lading for the load claimant was delivering on the date of the accident provided that deliveries were accepted between 7:30 a.m. and 3:30 p.m., Monday through Friday, with no appointment necessary. Spiro denied telling claimant that the load had to be delivered at a particular time. Spiro further testified that under the Agreement, respondent did not impose or in any way threaten to impose any monetary fines or consequences on claimant for late deliveries.

¶ 26    Spiro testified that claimant was not required to wear a uniform, shave, or wear his hair in a particular style. In addition, claimant was not required to take a specified route to a delivery destination. Spiro stated that claimant was not required to call in daily to report his status. Spiro denied that a driver would receive fewer loads in the future if he or she declined a load. Spiro testified that he never instructed claimant where to park his equipment. Spiro testified that under the Agreement, claimant had the option of hauling for other motor carriers. However, Spiro was not aware of claimant driving for any other company between March and June 2005.

¶ 27    Based on the foregoing evidence, the arbitrator awarded benefits. Relevant here, the arbitrator determined that the record contained some evidence indicative of an independent-contractor status, such as the method of payment, the lack of a dress code, and claimant's ownership of the tractor-trailer. Nevertheless, the arbitrator concluded that claimant ultimately established that he was respondent's employee on the date of the accident. In so finding, the arbitrator initially addressed the credibility of the parties, noting that, although claimant was argumentative and "reversed himself" when confronted with the Agreement, he was "credible overall." In contrast, the arbitrator concluded that all three of respondent's witnesses "exhibited some degree of bias." On the specific issue of the employment relationship, the arbitrator relied primarily on the level of control respondent exercised over claimant's work and the nature of claimant's work in relation to the general business of respondent. With respect to the issue of control, the arbitrator found that: (1) claimant drove exclusively for respondent; (2) claimant would have been subject to a number of conditions if he hauled for another entity; (3) respondent monitored the whereabouts of its drivers on its computer system; (4) claimant would be subject to reprisal for refusing a load; (5) respondent's hiring process required prequalification and participation in an orientation program; and (6) respondent had the right to disqualify a driver for safety reasons. The arbitrator also concluded that claimant owned the tractor-trailer "in name only" because, under the Agreement, respondent had exclusive possession, control, and use of the equipment for the duration of the Agreement and could, at its sole discretion, interchange the vehicle to other authorized carriers. A majority of the Commission affirmed and adopted the decision of the arbitrator. On judicial review, the circuit court of Cook County confirmed the decision of the Commission. This appeal by respondent followed.

¶ 28                                              III. ANALYSIS

¶ 29    On appeal, respondent argues that the Commission's finding that an employment relationship existed between it and claimant at the time of claimant's accident is against the manifest weight of the evidence.

- 7 -

¶ 30    Whether a claimant is classified as an independent contractor or an employee is crucial, for it is the employment status of a claimant which determines whether he is entitled to benefits under the Act. *Earley v. Industrial Comm'n*, 197 Ill. App. 3d 309, 314 (1990); see also *Roberson v. Industrial Comm'n*, 225 Ill. 2d 159, 174 (2007) (noting that an employment relationship is a prerequisite for an award of benefits under the Act). For purposes of the Act, the term "employee" should be broadly construed. *Ware v. Industrial Comm'n*, 318 Ill. App. 3d 1117, 1122 (2000). Nevertheless, the question of whether a claimant is an employee remains one of the most vexatious in the law of workers' compensation. *Roberson*, 225 Ill. 2d at 174. The difficulty arises from the fact-specific nature of the inquiry. *Roberson*, 225 Ill. 2d at 174. Notably, many jobs contain elements of both an employment and an independent-contractor relationship. *Kirkwood v. Industrial Comm'n*, 84 Ill. 2d 14, 20 (1981). Since there is no clear line of demarcation between the status of an employee and an independent contractor, no rule has been, or could be, adopted to govern all cases in this area. *Roberson*, 225 Ill. 2d at 174-75; *Kirkwood*, 84 Ill. 2d at 20.

¶ 31    To assist in determining whether a person is an employee, the supreme court has identified a number of factors. Among the factors cited by the supreme court are: (1) whether the employer may control the manner in which the person performs the work; (2) whether the employer dictates the person's schedule; (3) whether the employer compensates the person on an hourly basis; (4) whether the employer withholds income and social security taxes from the person's compensation; (5) whether the employer may discharge the person at will; and (6) whether the employer supplies the person with materials and equipment. *Roberson*, 225 Ill. 2d at 175. Another relevant factor is the nature of the work performed by the alleged employee in relation to the general business of the employer. *Roberson*, 225 Ill. 2d at 175; *Ware*, 318 Ill. App. 3d at 1122. The label the parties place on their relationship is also a consideration, although it is a factor of "lesser weight." *Ware*, 318 Ill. App. 3d at 1122. The significance of these factors rests on the totality of the circumstances, and no single factor is determinative. *Roberson*, 225 Ill. 2d at 175. Nevertheless, the right to control the work and the nature of the work are the two most important considerations. *Kirkwood*, 84 Ill. 2d at 21; *Ware*, 318 Ill. App. 3d at 1122.

¶ 32    The existence of an employment relationship is a question of fact for the Commission. *Ware*, 318 Ill. App. 3d at 1122. In resolving questions of fact, it is solely within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). We will overturn the Commission's resolution of a factual issue only if it is against the manifest weight of the evidence. *Ware*, 318 Ill. App. 3d at 1122. A factual finding is contrary to the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120564WC, ¶ 21. Consequently, when the evidence is "well balanced," it is the Commission's province to weigh the evidence and decide among competing inferences, and its decision will be upheld. *Roberson*, 225 Ill. 2d at 187; see also *Kirkwood*, 84 Ill. 2d at 20 ("[W]hen the facts of a particular case are susceptible to either interpretation, it is within the Industrial Commission's province to draw inferences and evaluate the credibility of the witnesses in arriving at a decision.").

¶ 33    We begin our analysis by addressing the right to control. Initially, we agree with the Commission that, while claimant owned the tractor-trailer he used to transport loads for respondent, claimant's ownership was in name only and the control respondent had over the equipment is indicative of an employment relationship. Significantly, the Agreement expressly provided that claimant's equipment was for respondent's "exclusive possession, control and use for the duration of [the] Agreement." While respondent purported to include this language in the Agreement solely to conform to federal regulations, it does not diminish the fact that respondent had the right to control claimant's activities. See *Ware*, 318 Ill. App. 3d at 1124 ("[T]he fact that [the employer] was acting to ensure compliance with federal regulations *** does not diminish the fact that it exercised control over [the employee]."). In this regard, we note that the Agreement allowed respondent, at its "sole discretion," to interchange the equipment respondent leased from claimant to other authorized carriers. Further, while respondent's witnesses testified that claimant was free to transport goods for other companies, it is undisputed that, between his date of hire and the date of the accident, claimant never actually hauled goods for any carrier other than respondent. More important, the evidence shows that claimant's ability to haul for another carrier was subject to a number of conditions imposed by respondent. According to Schaffer, to seek approval to transport goods for another company, the driver had to first notify respondent. Upon notification, respondent would contact the other carrier, ensure that there was "an agreement" between it and respondent, and conduct a credit check of the other carrier. The driver would then have to be "release[d]" by respondent to haul for the other carrier. That the other motor carrier had to have an "agreement" with respondent, the fact that a driver had to obtain a "release" from respondent to haul for another carrier, and respondent's right to interchange are strong indications that respondent had the right to control claimant's activities.

¶ 34    Other indicia of control evincing an employment relationship include the following. Prior to hire, respondent subjected prospective drivers to a "pre-qualification" process, which involved completing an application, undergoing a medical examination, and submitting to a drug test. Once hired, respondent required claimant to attend an orientation program. Further, respondent required claimant to display its name on his tractor while working for respondent, maintain the equipment in clean appearance, and inspect the equipment prior to each trip. The Agreement required claimant to notify respondent if an accident occurred, and respondent restricted the number of hours claimant could drive. While some of these requirements were mandated by federal regulations, as noted earlier, this does not diminish the fact that respondent had control over claimant's activities. See *Ware*, 318 Ill. App. 3d at 1124.

¶ 35    With respect to other indicia of control, we note claimant's testimony that Spiro called him every two hours to check on his location, that Spiro provided him specific instructions to the address he was delivering on the night of the accident, and that respondent imposed delivery deadlines. Claimant also indicated that he would not "dare" refuse a load or he would face consequences such as termination or not being allowed to haul for respondent for a period of time. Respondent's witnesses disputed claimant's testimony that respondent regularly monitored the location of its drivers, required its drivers to take a particular route when making a delivery, dictated delivery times, and punished drivers for rejecting a job. We also note that there was conflicting evidence regarding whether claimant was responsible for all costs and expenses associated with operating the tractor-trailer. In this regard, we noted

that the Agreement provided that claimant was responsible for the operating expenses. However, claimant testified that respondent reimbursed him for the cost of fuel, which is undoubtedly one of the most expensive operating expenses. In any event, this dueling evidence merely created a conflict for the Commission to resolve. See *Hosteny*, 397 Ill. App. 3d at 674 (noting that it is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicts in the evidence). The arbitrator concluded that although claimant was occasionally argumentative at the arbitration hearing and changed his testimony when confronted with the Agreement, he was "credible overall." The arbitrator also found that all three of respondent's witnesses exhibited some degree of bias. For instance, the arbitrator noted that Ramos was a long-time employee of respondent and testified in "a somewhat robotic and 'coached' manner as to the driver application and termination process." The arbitrator also pointed out that, although Schaffer has extensive experience in the trucking industry, he did not work for respondent during claimant's tenure. Finally, the arbitrator noted that Spiro "admitted to a fairly lengthy and ongoing relationship" with respondent. Ultimately, a majority of the Commission affirmed and adopted the decision of the arbitrator, including her credibility assessment. Thus, to the extent that claimant's testimony conflicted with that of respondent's three witnesses, it was within the prerogative of the Commission to credit claimant's testimony over that of Ramos, Schaffer, and Spiro. See *Labuz v. Illinois Workers' Compensation Comm'n*, 2012 IL App (1st) 113007WC, ¶ 33.

¶ 36    Of course, there was also control-related evidence suggesting independent contractor status. For example, respondent did not impose a dress code and it did not require claimant to shave or wear his hair in a particular manner. In addition, respondent exercised no control over the type of fuel claimant purchased or where he parked, and respondent did not instruct drivers to clean their equipment on a specified schedule. However, where, as here, there is conflicting evidence regarding a particular factor, we defer to the Commission's findings. *Roberson*, 225 Ill. 2d at 187; *Kirkwood*, 84 Ill. 2d at 20. Accordingly, we agree with the Commission that the indicia of control point to an employment relationship.

¶ 37    Next, we examine the nature of the work performed by claimant in relation to the general business of respondent. "Regarding this factor, our supreme court noted 'because the theory of workmen's compensation legislation is that the cost of industrial accidents should be borne by the consumer as a part of the cost of the product, this court has held that a worker whose services form a regular part of the cost of the product, and whose work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow, is presumptively within the area of intended protection of the compensation act.' " *Ware*, 318 Ill. App. 3d at 1124 (quoting *Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71 (1982)). Respondent's business was transporting machinery and metal products between sellers and buyers. Claimant's job was transporting goods for respondent's customers. Although Schaffer testified that claimant could carry freight for others, his ability to do so was subject to various conditions, and the evidence clearly demonstrates that claimant hauled exclusively for respondent between his date of hire and the date of the accident. Accordingly, we find that this factor points to an employment relationship.

¶ 38    With respect to the remaining factors, there are aspects of both an employment relationship and independent contractor status. Pointing to an independent contractor relationship is the fact that claimant was paid a per-job commission rather than on an hourly

basis, neither income nor social security taxes were withheld from claimant's payments, respondent did not provide any equipment or tools, and the Agreement referred to claimant as an independent contractor. Pointing to an employment relationship is the right to discharge. As noted above, here two clauses of the Agreement related to termination. One of those provisions provided that either party could terminate the Agreement for any reason at any time after 30 days after its effective date. This is indicative of an employment arrangement. *Ware*, 318 Ill. App. 3d at 1125-26 (noting that an at-will employment arrangement, which generally permits termination for any reason, is suggestive of an employment relationship).

¶ 39    In short, the foregoing evidence establishes that there are factors that weigh both in favor of and against a finding that claimant was an employee of respondent. However, it was the Commission's province to determine claimant's employment status. See *Roberson*, 225 Ill. 2d at 186-87; *Kirkwood*, 84 Ill. 2d at 20; *Earley*, 197 Ill. App. 3d at 318. Ultimately, the Commission concluded that an employment relationship existed between claimant and respondent. Based on an analysis of the relevant factors, and in light of the totality of the circumstances, we find that a conclusion opposite that of the Commission is not clearly apparent. Thus, we reject respondent's argument that the Commission's determination that an employment relationship existed between respondent and claimant at the time of the latter's injury is against the manifest weight of the evidence.

¶ 40                                    IV. CONCLUSION

¶ 41    For the reasons set forth above, we affirm the judgment of the circuit court of Cook County, which confirmed the decision of the Commission.

¶ 42    Affirmed.

¶ 43    PRESIDING JUSTICE HOLDRIDGE, dissenting.

¶ 44    I dissent. In my view, the manifest weight of the evidence in this case establishes that the claimant was an independent contractor, not an employee. The Commission's finding to the contrary (and the majority's affirmance of that finding) demonstrate that, under our court's current interpretation of the law, it has become virtually impossible for a trucking company and an independent driver/lessor to structure their relationship in a way that reliably precludes a finding of an employment relationship, even if that is the clear and expressed intent of both parties. Under our court's current approach, the Commission can almost always find an employment relationship and, once the Commission had made such a finding, we will affirm the Commission's determination so long as there is *any* evidence that even arguably suggests an employment relationship. Thus, we will defer to the Commission's finding of an employment relationship even if the weight of the evidence supports the opposite conclusion and even if the "evidence" in favor of an employment relationship consists primarily of acts the trucking company was required to perform by law. I do not believe that this expansive definition of "employment" or this undue deference to the Commission is mandated by Illinois law. In any event, I find our current approach to be unwise, unsound, and unfair. I write separately to suggest a different way forward.

¶ 45    In this case, the overwhelming weight of the evidence suggests that the claimant was an independent contractor. The claimant owned his tractor-trailer and leased it to the respondent.

- 11 -

The respondent did not provide the claimant with any tools or equipment and did not withhold income taxes on the claimant's behalf. The respondent did not control the work performed by the claimant by specifying the routes to be taken or by requiring the claimant to wear a uniform, shave, or wear his hair in any particular manner. Any required delivery times were established by the customers, not the respondent. Moreover, the written Agreement between the parties contains several hallmarks of an independent contractor relationship. For example, the agreement provided that: (1) the claimant would be compensated a specified percentage of the transportation revenue rather than paid a salary; (2) the claimant was responsible for the cost of the equipment, including (but not limited to) necessary licenses and permits, fuel, oil, tires, highway use taxes, weight taxes, fuel taxes, and toll charges; (3) the claimant was required to acquire "bobtail" insurance to cover the equipment when it was not operated in respondent's service; and (4) the claimant could drive for other carriers, subject to a credit check by the respondent.

¶ 46    In my view, the Commission's finding of an employment relationship is flawed in several respects. First, there was very little evidence suggesting that the respondent controlled the work performed by the claimant. The Commission found that the claimant owned the tractor-trailer "in name only" because, under the parties' Agreement, the respondent had "exclusive possession, control, and use" of the equipment for the duration of the Agreement. The majority agreed with this finding. However, as the Agreement states, the respondent was required by federal law to include this exclusivity provision in the Agreement. In fact, the Agreement explicitly states that this provision was included "*solely* to conform with" federal regulations and "shall not be used for any other purposes, *including any attempt to classify [claimant] as an employee of [respondent]*." (Emphases added.) Most of the other acts that purportedly demonstrate the respondent's control over the claimant's work in this case (*e.g.*, the respondent's "pre-qualification" process, its monitoring of the claimant's hours and driving status, and its requirement that the claimant inspect his truck) were also mandated by federal law. Because the respondent was required to perform these actions by law, I believe that they should not be taken as evidence of control by the respondent.

¶ 47    As the majority notes, we have previously ruled that a trucking company's compliance with regulations that require it to exercise control over a driver may be taken as evidence of the company's control, regardless of the company's motivations in doing so. See, *e.g.*, *Ware v. Industrial Comm'n*, 318 Ill. App. 3d 1117, 1124 (2000) ("[t]he fact that [the company] was acting to ensure compliance with federal regulations *** does not diminish the fact that it exercised control over [the claimant]"); see also *Earley v. Industrial Comm'n*, 197 Ill. App. 3d 309, 315 (1990). However, our supreme court has cautioned that a trucking company's compliance with such federal regulations, standing alone, does not compel a finding of an employment relationship. *Roberson v. Industrial Comm'n*, 225 Ill. 2d 159, 177-79 (2007). Although compliance with such regulations is mandatory, "the federal requirements are not so radically intrusive as to absolve lessors *** of otherwise existing obligations under *** contracts allocating financial risk among private parties." (Emphasis and internal quotation marks omitted.) *Id.* at 178. "Freedom of contract requires that parties may structure their relationship as they see fit, provided they do not neglect the requirements of federal law." *Id.* Indeed, the governing regulations themselves make clear that a trucking company's compliance with the written lease requirements of the Federal Motor Carrier Safety

Regulations does not resolve the question of a driver's employment status. Section 376.12(c)(4) of those regulations provides:

> "Nothing in the provisions required by paragraph (c)(1) of this section[1] is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements." 49 C.F.R. § 376.12(c)(4) (2005).

Accordingly, our supreme court has ruled that a trucking company's compliance with federal regulations is "merely a factor that may be considered in a common law analysis of whether a driver is an employee of [the] trucking company." *Roberson*, 225 Ill. 2d at 178. It should not be given undue weight or deemed dispositive particularly where, as here, there is ample evidence (including a written contract) suggesting that the parties intended the driver to be an independent contractor. See *id.* at 177-79.

¶ 48     Courts in other jurisdictions have taken an even stricter approach. These courts have held, as a matter of law, that a trucking company's compliance with federal regulations should *not* be considered evidence of the company's control over a driver's work for purposes of determining the driver's employment status. For example, in *Universal Am-Can, Ltd. v. Workers' Compensation Appeal Board*, 762 A.2d 328 (Pa. 2000), a Pennsylvania Workers' Compensation Judge found that a trucking company had exercised sufficient control over a driver's work to give rise to an employment relationship where, *inter alia*, the parties signed a Contractor Operating Agreement providing that the company "took exclusive control" over the driver's tractor-trailer and the company performed other actions required by federal regulations. The Workers' Compensation Appeals Board and the trial court affirmed. However, the Supreme Court of Pennsylvania reversed. The court ruled that "[b]ecause a motor carrier has no ability to negotiate aspects of the operation of leased equipment that are regulated, these factors may not be considered in resolving whether an owner-operator is an independent contractor or employee." *Id.* at 334. The court reasoned that "[n]either party has bargaining power, or the ability to control the work to be done, when dealing with matters subject to regulation." *Id.* at 334-35. Moreover, the court ruled that "[t]he obligations imposed by law upon a motor carrier *** when leasing equipment from an owner-operator are not probative of the question of whether the carrier exercises control over the manner of the work to be performed by the owner-operator" because "[t]he regulations reflect the control of the government, not the motor carrier." *Id.* at 336.

¶ 49     Other courts have reached the same conclusion. See, *e.g.*, *Hernandez v. Triple Ell Transport, Inc.*, 175 P.3d 199, 205 (Idaho 2007) ("[Respondent trucking company's] adherence to federal law is no evidence of its control over [claimant driver]. The federal government–not [respondent]–exerted control over [claimant]."); *National Trailer Convoy, Inc. v. Employment Security Agency*, 360 P.2d 994, 997 (Idaho 1961) ("Requirements that truck and driver meet Interstate Commerce Commission standards *** point toward compliance with governmental regulations, and are not indicia of an employer-employee

---

[1] Section 376.12(c)(1) provides that "[t]he lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1) (2005).

relationship."). Similarly, in an appeal of a National Labor Relations Board decision finding that a trucking company committed an unfair labor practice, the United States Court of Appeal for the District of Columbia Circuit ruled that:

> "[R]estrictions upon a worker's manner and means of performance that spring from government regulation (rather than company initiatives) do not necessarily support a conclusion of employment status. [Citation.] Indeed, employer efforts to ensure the worker's compliance with government regulations, even when those efforts restrict the manner and means of performance, do not weigh in favor of employee status. [T]he employer cannot evade the law *** and in requiring compliance with the law he is not controlling the driver. It is the law that controls the driver. [Citation.]" (Internal quotation marks omitted.) *North American Van Lines, Inc. v. National Labor Relations Board*, 869 F.2d 596, 599 (D.C. Cir. 1989).

¶ 50    I find these decisions to be well reasoned. A trucking company cannot choose to disregard or negotiate its way around the requirements of federal law. These requirements are mandatory and binding upon the company and the driver alike. Accordingly, a company's compliance with regulations that require it to exercise control over a driver do not evidence the *company's* control over the driver. Rather, they evidence the *government's* control over the both the driver and the company. As such, they should not be considered evidence of the company's control for purposes of determining the driver's status as an employee or an independent contractor.

¶ 51    I acknowledge that our supreme court has not adopted these sound principles. I hope that it will do so in the near future. However, even under our supreme court's current approach, the evidence in this case does not establish that the respondent controlled the claimant's work. The vast majority of acts that the majority and the Commission have relied upon to establish the respondent's control were mandated by federal law.[2] The Commission and the majority have placed undue emphasis on these factors and ignored the overwhelming weight of the evidence suggesting an opposite conclusion. For example, the Commission and the majority declined to enforce the plain terms of the parties' written Agreement which stated that: (1) the claimant was an independent contractor; and (2) the respondent's compliance with a federal regulation requiring it to assert exclusive control over the claimant's

---

[2]In concluding that the claimant was an employee, the Commission relied upon certain facts aside from the respondent's compliance with federal regulations. However, several of these facts are either irrelevant or highly suspect. For example, the Commission noted that the claimant drove exclusively for the respondent between his date of hire and the date of the accident. However, this proves very little, because the accident occurred only two months after the claimant was hired. Moreover, the Commission relied on the claimant's testimony that he was not free to drive for other carriers and that he "dared not" refuse loads from the respondent for fear of adverse consequences. These claims were refuted by several of the respondent's witnesses. Although it is for the Commission to resolve conflicts in the evidence and determine the credibility of witnesses, the Commission's credibility determinations in this case were inexplicable. The Commission found the claimant to be more credible than the respondent's witnesses (whom the Commission assumed were "biased") even though: (1) it acknowledged that the claimant was "argumentative" and that he "reversed himself" when confronted with the Agreement; and (2) as the dissenting Commissioner noted, there is no reason to suspect that the respondent's witnesses were any more "biased" than the claimant, who stood to gain financially from a finding that he was an employee.

equipment could not be taken as evidence of an employment relationship. Even assuming that the respondent's compliance with federal regulations has some minimal probative value under *Roberson*, this does not change the fact that the manifest weight of the evidence established that the claimant was an independent contractor rather than an employee. Thus, under *Roberson*, the Commission's decision should be overturned.

¶ 52    In support of its holding, the majority also stresses the connection between the nature of the work performed by the claimant and the nature of the respondent's business. *Supra* ¶ 38. The majority concludes that, because the respondent's business was transporting machinery and metal products and the claimant transported the same type of goods exclusively for the respondent and its customers, this factor weighs in favor of finding an employment relationship. *Id.* I disagree. As the majority notes, our supreme court has ruled that:

> "because the theory of workmen's compensation legislation is that the cost of industrial accidents should be borne by the consumer as a part of the cost of the product, this court has held that a worker whose services form a regular part of the cost of the product, and whose work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow, is presumptively within the area of intended protection of the compensation act." *Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71 (1982).

See also *Ware*, 318 Ill. App. 3d at 1124. Applying this rule, our supreme court and our appellate court have repeatedly found an employment relationship where, *inter alia*, the claimant performs work that is "an integral part of" or is "intimately related to" the respondent's business. *Ware*, 318 Ill. App. 3d at 1125.

¶ 53    I question the logic of these decisions. The purpose of finding an employment relationship under such circumstances is, purportedly, to ensure that that "the cost of industrial accidents [is] borne by the consumer as a part of the cost of the product." *Ragler Motor Sales*, 93 Ill. 2d at 71. However, that result could be achieved just as effectively without finding an employment relationship. A driver may obtain his own workers' compensation insurance as an independent contractor. Presumably, the cost of such insurance would be reflected in the price that he charges the trucking company for his services and then passed on to the company's customers. Thus, the cost of the accident will be "borne by the [trucking company's] consumers as part of the cost of the product" regardless of whether the claimant is deemed an employee or an independent contractor. Moreover, under the rule currently applied by our courts, this factor will *always* cut in favor of finding an employment relationship in cases involving truck drivers because the driver's work will always be "an integral part of" the trucking company's business. Because of the importance that our courts attach to this factor, this stacks the deck heavily in favor of an employment relationship in every instance. Thus, in my view, courts should stop considering this factor in trucking industry cases like the case at bar.

¶ 54    One final point bears mentioning. As I mentioned above, I am concerned that we are applying an overly deferential standard of review to Commission determinations regarding a claimant's employment status. In this case, the majority appears to take the position that we must affirm the Commission's finding of an employment relationship if there is *any* conflicting evidence in the record. *E.g.*, *supra* ¶ 37. That is not what manifest weight of the evidence review requires. It is true that, under manifest weight review, we must affirm the Commission's decision if there is "sufficient evidence" to support it, and we will overturn the

decision only if "an opposite conclusion [is] clearly apparent." *Dig Right In Landscaping v. Illinois Workers' Compensation Comm'n*, 2014 IL App (1st) 130410WC, ¶ 27. However, although we are reluctant to set aside the Commission's decision on a factual question, "we will not hesitate to do so when the clearly evident, plain, and indisputable weight of the evidence compels an opposite conclusion." *Id.*; *Montgomery Elevator Co. v. Industrial Comm'n*, 244 Ill. App. 3d 563, 567 (1993). Thus, we need not affirm a Commission's decision merely because there is *some* evidence, however slight, that arguably supports the Commission's decision. Even if some such evidence exists, we should reverse if "the clearly evident, plain, and indisputable weight of the evidence compels an opposite conclusion."

¶ 55    The same rule applies to Commission determinations of a claimant's employment status. We must uphold the Commission's decision in such cases when the evidence is "well balanced" (*Roberson*, 225 Ill. 2d at 187), *i.e.*, "when the facts of a particular case are susceptible to either interpretation" (internal quotation marks omitted) (*Earley*, 197 Ill. App. 3d at 314). However, we may overturn the Commission's decision where, as here, the opposite conclusion is "clearly apparent," even if there is some small amount of evidence that arguably supports the Commission's decision. We should not affirm where the overwhelming weight of the evidence supports the opposite conclusion.

¶ 56    A contrary rule would unduly restrict our review by according greater deference to the Commission than is required under manifest weight review. It would also make it virtually impossible for a party to obtain reversal of a Commission decision regarding a claimant's employment status.